United States District Court
Southern District of Texas
**ENTERED**
September 03, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:19-cv-00068

BRANDON THROWER ON BEHALF OF HIMSELF AND
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, *PLAINTIFF*,

v.

UNIVERSALPEGASUS, INT'L INC., AND UNIVERSAL ENSCO, INC., *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

Before the court is Brandon Thrower's motion for conditional certification under the Fair Labor Standards Act.[1] Having considered the parties' arguments and the applicable law, and for the reasons discussed below, the court grants the motion.

## I.    FACTUAL BACKGROUND

The defendants—Universal Ensco, Inc. ("UEI") and its parent company, UniversalPegasus International, Inc. ("UPI")—operate a pipeline-engineering firm that provides engineering and field services to oil, gas, and power clients across the United States and internationally.[2]

---

[1]     Dkt. 28.

[2]     Dkt. 31 at 7. Page-number citations to documents that the parties have filed refer to those that the court's electronic-case-filing system automatically assigns.

1

Thrower worked for UEI as an electrical and instrumentation inspector in Oklahoma and Kansas from December 10, 2017, through April 11, 2018.[3] During his employment, Thrower claims he was compensated on a day-rate basis, meaning he received a flat daily rate and was not paid overtime for any work he performed in excess of 40 hours per workweek.[4]

On February 18, 2019, Thrower sued the defendants for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, on behalf of himself and similarly situated "inspectors."[5] Thrower claims the defendants misclassify UEI's inspectors as exempt from overtime compensation under UEI's day-rate compensation scheme.

Since filing suit, three former UEI inspectors have opted-in as plaintiffs: (1) Chris Guinn, an electrical and instrumentation inspector stationed in Florida from September 2017 to June 2018; (2) Travis Hatfield, a utility inspector stationed in Texas from August 2018 to June 2019; and (3) Cody Hill, identified only as an "inspector," stationed in Texas from July 2018 to August 2019.[6]

On December 23, Thrower moved for conditional certification, requesting the court conditionally certify the following putative class:

> All current and former Inspectors whose offer letters state that they were paid a day rate in an amount that is less than the weekly salary amount necessary for the 29 U.S.C. § 213(a)(1) exemptions during at

---

[3]    Dkt. 28–15.

[4]    Dkt. 31 at 7.

[5]    Dkt. 1.

[6]    Dkts. 11, 22, 26; *see also* Dkt. 28–16 (Guinn's declaration); Dkt. 28–17 (Hatfield's declaration); Dkt. 28–18 (Hill's declaration).

least one week in the three[-]year period prior to the date the Court authorizes notice to the present.[7]

In response, the defendants vociferously argue that they have fully complied with the FLSA. Specifically, while acknowledging that UEI's offer letter sets forth, among other things, the employee's pay for each day of work and the number of days per week the employee is expected to work, the defendants argue this compensation scheme qualifies as a salary, thereby exempting those employees from the FLSA's overtime provisions.[8] According to the defendants, UEI's offer letter establishes a "guaranteed salary," which the court can determine using a rate-times-day formula:

> First, the [offer] letter provides the amount an employee will be paid for each day in which the employee performs any work. Second, the letter provides the number of days the employee is expected to work each week. To determine the employees' minimum guaranteed salary, UEI multiplies the daily amount against the number of days the employee is expected to work.[9]

The defendants argue further that certifying a putative class of "all current and former inspectors" is inappropriate as UEI employs "more than fourteen different" types of inspectors, each with different job titles and responsibilities.[10] According to the defendants, each inspector position "differ[s] in reporting structure, daily duties, and numerous other aspects of day-to-day operations."[11]

---

[7] Dkt. 28 at 7.

[8] Dkt. 31–1 at 3.

[9] *Id.* at 4.

[10] Dkt. 31 at 20–22.

[11] *Id.* at 8.

Moreover, inspectors who share the same job title may have varying responsibilities, depending upon "which UEI client is operating the project site."[12]

In his reply, Thrower highlights that the defendants do not dispute that each inspector, irrespective of his or her official job title or responsibilities, was classified as exempt and subject to the same day-rate pay practice.[13]

For reasons explained *infra*, on August 6, 2020, the court held a hearing to discuss the impact of the Fifth Circuit's recent opinion in *Hewitt v. Helix Energy Solutions Group, Inc.* on the parties' respective arguments both for and against conditional certification.[14] At the conclusion of the hearing, the court requested each party file a proposed class definition.[15] Thrower amended his proposed class definition as follows:

> All current and former inspectors employed by Universal Ensco, Inc. and [sic] whose offer letter stated that they were paid a daily rate during at least one week in the three-year period prior to the date the Court authorizes notice to the present.[16]

---

[12]     *Id.* at 21.

[13]     Dkt. 33 at 6.

[14]     956 F.3d 341 (5th Cir. 2020).

[15]     The defendants take issue with the fact that Thrower's amended proposed class definition "improperly attempts to <u>expand</u> his putative collective action beyond the scope" of his motion for conditional certification. *See* Dkt. 56 (emphasis in original). Their argument misconstrues the court's instruction. In no way did the court restrict Thrower from amending the proposed class to include a wider range of employees.

[16]     Dkt. 53 at 1–2.

## II.   LEGAL STANDARDS

### A. FLSA Obligations

Under the FLSA, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."[17] The FLSA gives employees the right to bring an action on behalf of themselves, as well as "other employees similarly situated."[18] Section 216(b) establishes an opt-in scheme under which plaintiffs must affirmatively notify the court of their intention to become parties to the suit.[19]

### B. Conditional Certification

District courts have the discretionary power to conditionally certify collective actions and order notice to putative class members.[20] When considering whether to certify a lawsuit under the FLSA as a collective action, most courts, including those in this circuit, use the *Lusardi*[21] two-stage approach.[22]

The two stages of the *Lusardi* approach are the "notice stage" (sometimes referred to as the "conditional-certification stage") and the "decertification stage."

---

[17]     29 U.S.C. § 207(a)(1).

[18]     29 U.S.C. § 216(b).

[19]     *McKnight v. D. Hous., Inc.*, 756 F. Supp. 2d 794, 800 (S.D. Tex. 2010) (Rosenthal, J.).

[20]     *Id.*

[21]     *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).

[22]     *McKnight*, 756 F. Supp. 2d at 800 (collecting cases).

At the notice stage, the district court conducts an initial inquiry into "whether the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class."[23]

Because of the limited evidence available at the notice stage, "this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class."[24] In fact, courts "appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."[25]

Still, at the notice stage, the plaintiff bears the burden of showing that a similarly situated group of plaintiffs exists.[26] To do so, the plaintiff must generally make a minimal showing that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; and (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted.[27] With regard to the similarly situated factor, "[s]ome factual support for

---

[23]   *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 519 (5th Cir. 2010) (citation omitted).

[24]   *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995).

[25]   *Id.* at 1214 n.8 (quoting *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J.)).

[26]   *See Green v. Plantation of Louisiana, LLC*, CIV. 2:10-0364, 2010 WL 5256354, at *6 (W.D. La. Nov. 24, 2010) ("while the standard at the 'notice stage' is lenient, it is by no means automatic" (citations omitted)), *report and recommendation adopted*, CIV. 2:10-0364, 2010 WL 5256348 (W.D. La. Dec. 15, 2010).

[27]   In the absence of Fifth Circuit guidance on the appropriate test to use at the notice stage, courts are split on the appropriate elements to consider. Some courts use three elements, requiring the plaintiff to show that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt-in to the lawsuit. *Jones v. Cretic Energy Servs.*, LLC, 149 F. Supp. 3d 761, 768 (S.D. Tex. 2015)

the complaint allegations of class-wide policy or practice must be shown to authorize notice."[28]

At the end of the day, "[c]ollective actions under the FLSA are generally favored because such allegations reduce litigation costs for the individual plaintiffs and create judicial efficiency by resolving in one proceeding [all] 'common issues of law and fact arising from the same alleged . . . activity.'"[29]

## III.   ANALYSIS

The bulk of each parties' briefing concerns a since-withdrawn Fifth Circuit opinion: *Faludi v. U.S. Shale Solutions, LLC*, ("*Faludi I*").[30] To help frame the parties' respective arguments, a brief discussion of the FLSA's overtime-compensation provisions and, more specifically, when employees are exempt from those provisions is helpful.

Under the FLSA, individuals employed in a *bona fide* executive, administrative, or professional capacity are completely exempt from overtime

---

(Lake, J.) (collecting cases). This court, however, has already joined the growing number of courts in the Southern District that have rejected the three-element approach to *Lusardi's* conditional-certification stage. *See Freeman v. Progress Residential Prop. Manager, LLC*, 3:16-CV-00356, 2018 WL 1609577, at *6 (S.D. Tex. Apr. 3, 2018) (Edison, M.J.).

[28]     *Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 466 (S.D. Tex. 2012) (Ellison, J.) (quoting *Maynor v. Dow Chem. Co.*, CIV. A. G-07-0504, 2008 WL 2220394, at *6 (S.D. Tex. May 28, 2008) (Rosenthal, J.)); *see, e.g., Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266 (D. Minn. 1991) (allegations of plaintiff alone insufficient); *Felix De Asencio v. Tyson Foods, Inc.*, 130 F. Supp. 2d 660, 663 (E.D. Pa. 2001) (pleadings and four declarations from putative class members sufficient).

[29]     *Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 823 (N.D. Tex. 2007) (quoting *Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989)).

[30]     936 F.3d 215 (5th Cir. 2019), *opinion withdrawn and superseded*, 950 F.3d 269, 271 (5th Cir. 2020).

compensation.[31] To establish an employee's exempt status, an employer must show, by a preponderance of the evidence, that the employee meets both the FLSA's "salary basis" test and the appropriate "duties" test for the exemption which purportedly applies.[32]

Although the defendants do not expressly argue the FLSA's executive, administrative, or professional-capacity exemptions apply, based on the arguments they raise in their briefing regarding the salary-basis test and duties tests, as well as the cases they cite in support, it is clear the defendants contend that (at least) the administrative and executive exemptions are in play.[33]

29 C.F.R. § 541.600 sets forth the minimum weekly salary an employee must receive to qualify as an exempt executive, administrative, or professional employee. At the time Thrower filed the underlying lawsuit,[34] the minimum weekly

---

[31]    29 U.S.C. § 213(a)(1).

[32]    *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 262 (5th Cir. 2000); *see Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) ("The employer must prove facts by a preponderance of the evidence that show the exemption is 'plainly and unmistakably' applicable." (citations omitted)).

[33]    *See* Dkt. 31 at 16–22. Moreover, buried among their affirmative defenses, the defendants argue "statutory exemptions, exclusions, exceptions, or credits under the FLSA, including but not limited to the [h]ightly[-c]ompensated[-e]mployee [e]xemption, [a]dministrative [e]xemption, the [e]xecutive [e]xemption, and combination exemption" bar Thrower's and the opt-in plaintiffs' claims. *See* Dkt. 21 at 8.

[34]    Sections 541.100(a)(1) and 541.200(a)(1) were recently amended, effective January 1, 2020, to increase the minimum applicable weekly salary from $455 per week to $684 per week. 29 C.F.R. §§ 541.100(a)(1) (executive exemption) and 541.200(a)(1) (administrative exemption); *see also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51230, 51230-31 (Sept. 27, 2019). The current regulation differs in no other material way from the version in effect at the time Thrower filed the underlying lawsuit.

salary was $455.[35] While the salary-basis test is a bit more nuanced, for purposes of the court's opinion, the minimum-weekly-salary requirement is the key takeaway.

In *Faludi I*, the plaintiff, Jeff Faludi, received $1,000 per day (or $1,350 if he worked outside of Houston) consulting for an oil and gas services company.[36] The Fifth Circuit, while acknowledging that a day-rate compensation is distinct from a salary under the FLSA, held that if an employee's day-rate pay was at least $455, then the employee received a predetermined amount of compensation on a weekly (or less frequent) basis necessary to satisfy the salary-basis test.[37] In other words, Faludi was guaranteed to receive at least $1,000 if he worked for even one hour in a given week, which exceeds the regulatory minimum of $455.[38]

Notably, Judge James Ho—who later authored *Hewitt*—dissented from the majority's opinion, applying a strict reading of 29 C.F.R. § 541.602(a), which provides in relevant part:

> An employee will be considered to be paid on a 'salary basis' within the meaning of this part if the employee regularly receives each pay period *on a weekly, or less frequent basis,* a *predetermined amount* constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.[39]

---

[35]   29 C.F.R. §§ 541.100(a)(1) (executive exemption) and 541.200(a)(1) (administrative exemption).

[36]   *Faludi I*, 936 F.3d at 217.

[37]   *Id.* at 219–20.

[38]   *Id.* at 219.

[39]   *Id.* at 222 (emphasis included) (citing 29 C.F.R. § 541.602(a)).

In Judge Ho's mind, because Faludi's pay depended on the number of days he worked in a given week, he could not, as a matter of law, receive a "predetermined amount" on a weekly basis.[40]

In February 2020, the Fifth Circuit withdrew *Faludi I* and decided the case on entirely new grounds (*Faludi II*).[41] Both parties in this case supplemented their conditional-certification briefing to address *Faludi II*. Not surprisingly, both sides argue *Faludi II* does not undermine their respective positions.[42] The defendants, applying the same reasoning as the majority in *Faludi I*, contend UEI's inspectors' "guaranteed" weekly salary can be determined by multiplying the employee's daily rate of pay by the numbers of "work days per week"—both of which are expressly stated in UEI's offer letter.[43] Using Thrower's offer letter as an example, applying the rate-times-day formula, according to the defendants, Thrower's "guaranteed" weekly salary is $2,225 ($445 day-rate x 5 "work days per week")—well above the FLSA's minimum salary requirement for exemption from overtime compensation.[44]

Thrower, on the other hand, argues his day-rate pay ($445) is below the FLSA's minimum-weekly-salary requirement for exemption from overtime

---

[40]    *Id.*

[41]    *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273–75 (5th Cir. 2020) ("*Faludi II*") ("Although we think U.S. Shale's arguments are well-taken as to why Faludi fits within the highly compensated employee exemption to the FLSA, we need not reach that issue given that Faludi is an independent contractor not covered by the FLSA's requirements.").

[42]    *See* Dkts. 34 and 42.

[43]    Dkt. 31 at 11–13; *see, e.g.,* Dkt. 28–5 at 1; Dkt. 28–6 at 1; Dkt. 28–7 at 1.

[44]    *See* Dkt. 28–5.

compensation ($455) and, therefore, the reasoning in *Faludi I*—that if he worked "for even one hour in a given week" he was guaranteed an amount that exceeds the regulatory minimum of $455—does not apply.[45]

Two months after withdrawing *Faludi I*, the Fifth Circuit issued *Hewitt*, in which it unambiguously held that "an employee who is paid a daily rate is not paid on a 'salary basis' under 29 C.F.R. § 541.602(a)."[46] Hewitt's day-rate pay was between $900–$1,300.[47] But his compensation depended on the number of days he worked in a given week (past tense), meaning his weekly salary fluctuated from week to week.[48] Strictly interpreting 29 C.F.R. § 541.602(a), the Fifth Circuit reasoned as follows:

> Broadly speaking, [29 C.F.R.] § 541.602(a) requires that an employee receive for each pay period a "predetermined amount" calculated on a "weekly, or less frequent" pay period. To put it plainly: The salary-basis test requires that an employee know the amount of his pay compensation for each weekly (or less frequent) pay period during which he works, *before* he works.[49]

Because Hewitt "knew his pay only *after* he worked through the pay period," the court held "he did *not* receive a 'predetermined amount' 'on a weekly, or less

---

[45]   Dkt. 28 at 14–15.

[46]   *See Hewitt*, 956 F.3d at 342.

[47]   *Hewitt v. Helix Energy Sols. Grp., Inc.*, 4:17-CV-2545, 2018 WL 6725267, at *1 (S.D. Tex. Dec. 21, 2018) (Hoyt, J.).

[48]   *Hewitt*, 956 F.3d at 344.

[49]   *Id.* at 343 (emphasis in original).

frequent basis'—rather, he received an amount contingent on the number of days he worked each week."[50]

In the case at bar, the defendants attempt to distinguish UEI's pay practice from that at issue in *Hewitt,* citing a footnote in that opinion: "If Hewitt and [his employer] agreed beforehand on the length of each hitch, there could be an argument that Hewitt's salary was 'predetermined.'"[51] The defendants argue UEI pays a predetermined salary because the UEI offer letter provides: "Compensation for this position will be at a weekly predetermined amount which equals the daily rate listed above multiplied by the number of days in the work week while you are at the work site and available to work."[52]

The defendants are trying to fit a square peg in a round hole. As in *Hewitt*, it is impossible for UEI's employees to determine their weekly salary until *after* they have worked through the pay period—meaning, by definition, the salary is not predetermined.[53] Any doubt is put to rest by reading the very next sentence in UEI's offer letter: "The number of days per week listed above is the *anticipated number of work days for a typical work week* and *is subject to change.*"[54] Thus, contrary to the defendants' protestations otherwise, determining whether each

---

[50]   *Id.* at 343–44 (emphasis in original).

[51]   Dkt. 56 at 2–3 (citing *Hewitt*, 956 F.3d at 344 n.3 (because Hewitt's employer did not raise the argument before the district court, the Fifth Circuit did not consider the argument on appeal)).

[52]   Dkt. 31 at 17.

[53]   *See Hewitt*, 956 F.3d at 344 ("[Hewitt] had to take the number of days he worked (past tense) and multiply by the operative daily rate to determine how much he earned. So Hewitt knew his pay only *after* he worked through the pay period." (emphasis in original)).

[54]   *See, e.g.,* Dkt. 28–7 at 2 (emphasis added).

opt-in plaintiff is exempt from the FLSA's overtime-compensation requirements will not "require a case-by-case investigation of the actual application of [the] [d]efendants' pay policies . . ."[55]

## A. *Lusardi's* Two-Stage Approach

## 1. Whether Other Aggrieved Individuals Exist

Next, the court considers whether there is a reasonable basis for crediting Thrower's assertion that other aggrieved individuals exist.[56] In addition to his own declaration,[57] Thrower has included declarations from the three opt-in plaintiffs—which are practically identical, save for the declarants' name, dates of employment, and the state(s) in which he was employed—who testify they: (1) were employed by the defendants as "inspectors"; (2) were compensated on a day-rate basis; (3) regularly worked more than 40 hours in a given workweek; and (4) were not paid overtime.[58] Additionally, each declarant, including Thrower, testifies he knows other inspectors who regularly worked over 40 hours per week who did not receive overtime pay because UEI misclassified them as exempt.[59] On this record, the court finds Thrower has established a reasonable basis for crediting his assertion that other aggrieved individuals exist.

---

[55]     Dkt. 31 at 18.

[56]     *McKnight*, 756 F. Supp. 2d at 801.

[57]     Dkt. 20–15 (Thrower).

[58]     Dkt. 20–16 (Guinn); Dkt. 20–17 (Hatfield); Dkt. 20–18 (Hill).

[59]     *See* Dkt. 20–15; Dkt. 20–16; Dkt. 20–17; Dkt. 20–18.

## 2. Whether the Aggrieved Individuals Are Similarly Situated to Thrower

The parties' war is primarily waged on this final front—whether the aggrieved "inspectors" are similarly situated to Thrower in relevant respects given the claims and defenses asserted.[60]

Thrower and the proposed putative class members share the same title of "inspector." But the defendants have demonstrated UEI maintains "more than fourteen" different positions[61] that use this term: assistant chief inspector, chief

---

[60]  *See Minyard v. Double D Tong, Inc.*, 237 F. Supp. 3d 480, 490 (W.D. Tex. 2017) ("A class that encompasses a wide range of job positions may be conditionally certified as long as the differences between class members are not material to the allegations of the case." (citing *Behnken v. Luminant Min. Co., LLC*, 997 F. Supp. 2d 511, 522 (N.D. Tex. 2014)).

[61]  **Assistant Chief Inspector**: responsible for assisting the Chief Inspector with the management and direction of the inspection team.

**Chief Inspector**: responsible for the day-to-day implementation of quality-control inspection throughout the construction spread; responsible for the supervision of the inspection team.

**Certified Welding Inspector**: responsible for overseeing all welding and non-destructive examination ("NDE") activities on the project and ensuring that all welding and NDE activities, and all documentation relating to same, are in compliance with all project, regulatory, and applicable code/standard requirements; certified in one or more of the following: AWS-CWI, AWS-SCWI, or CPWI.

**Coating Inspector**: responsible for ensuring that all field-coating applications, including painting of above-ground facilities, are performed according to project-coating specifications.

**Compliance Quality Inspector**: responsible for performing quality inspections and verifications for gas pipeline construction and O&M activities.

**Electrical and Instrumentation Inspector**: inspects the electrical and instrumentation activities on the project, ensuring that all documentation relating to the same comply with project, regulatory, and applicable code/standard requirements.

**Environmental Inspector**: responsible for overseeing the installation of environmental-mitigation measures, including straw bale filters, silt fence erosion control fabric, geotextile fabric, gravel filters, water bars, and trench plugs.

**Fabrication Welding Inspector**: responsible for overseeing all pipefitting and welding activities associated with the fabrication of plant stations and other fabricated assemblies

inspector, certified welding inspector, coating inspector, compliance quality inspector, electronical and instrumentation inspector, environmental inspector, fabrication welding inspector, materials inspector, mechanical inspector, NACE coating inspector, non-destructive examination inspector, safety inspector, senior welding inspector, utility inspector, vendor mill inspector, and welding inspector.[62]

---

such as value settings and launcher/receiver facilities. Also oversees the setting and plumbing of the completed fabricated assemblies.

**Material Inspector**: responsible for facilitating the timely receipt of all materials and enforcing material quality control.

**Mechanical Inspector**: responsible for inspecting the mechanical activities on the project, ensuring that all documentation relating to the same comply with project, regulatory, and applicable code/standard requirements.

**NACE Coating Inspector**: NACE Coating Inspector Program certified; responsible for quality control in the observation and reporting of the technical aspects of the coating project and its conformance/deviation from the project specification.

**NDE Inspector**: responsible for reviewing reports by the NDE contractor and for auditing welds to confirm acceptability; oversees the field implementation of the company's non-destructive testing program and confirming compliance with the program and applicable regulatory and code/standard requirements.

**Safety Inspector**: oversees all activities of field personnel; develops and implements plan for employee safety and ensures that safety and health concerns are given primary consideration.

**Senior Welding Inspector**: responsible for overseeing all welding and NDE activities on the project, ensuring that all welding and NDE activities, and all documentation relating to same, comply with project, regulatory, and applicable code/standard requirements.

**Utility Inspector**: ensures that all pipeline-construction activities adhere to client, company, and contract specifications and codes.

**Vendor Mill Inspector**: responsible for inspecting multiple areas including pipe, mill, bench, coating, and loading out material.

**Welding Inspector**: responsible for welding and NDE activities on the project, ensuring that all welding and NDE activities, and all documentation relating to same, comply with project, regulatory, and applicable code/standard requirements.

[62]   Dkt. 31 at 8–10, 16–18.

The defendants forcefully argue that each inspector position has different responsibilities, which militates strongly against finding such employees are similarly situated for conditional certification purposes.[63] Moreover, the defendants contend inspectors who share the same job title may have varying responsibilities, depending upon "which UEI client is operating the project site."[64]

Generally, courts require that members of an FLSA class have similar job titles and responsibilities.[65] But "similarly situated" does not mean identically situated.[66] Rather, to satisfy *Lusardi's* similarly situated requirement, a plaintiff must show that potential class members are "similarly situated . . . *in relevant respects given the claims and defenses asserted.*"[67] So, while the defendants are correct that courts have found "employees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day duties vary substantially,"[68] potential class members' job titles or responsibilities are not the end-all-be-all.

The purpose of requiring class members to have similar job positions is to ensure judicial efficiency by "avoiding the need for individualized inquiries into

---

[63]     *Id.* at 10, 16–18.

[64]     *Id.* at 21.

[65]     *See, e.g., Pacheco v. Aldeeb*, No. 5:14–CV–121–DAE, 2015 WL 1509570, at *6 (W.D. Tex. Mar.31, 2015) (holding that for class members to be similarly situated they must be subject to common pay provisions *and* have similar job requirements).

[66]     *Green*, 2010 WL 5256354, at *4.

[67]     *Walker*, 870 F. Supp. 2d at 466 (emphasis added) (citations omitted).

[68]     Dkt. 31 at 15 (citing *Aguirre v. SBC Communications, Inc.*, CIV.A.H 05 3198, 2007 WL 772756, at *12 (S.D. Tex. Mar. 12, 2007) (Rosenthal, J.)).

16

whether a defendant's policy violates the FLSA as to some employees but not others."[69] With this in mind, courts generally focus on the similarity of the potential class members' job positions (*i.e.,* titles and responsibilities), because "the nature of the work performed by each plaintiff will determine (a) whether an FLSA violation occurred and (b) whether a relevant FLSA exemption applies."[70] But, if the alleged FLSA violations do not turn on the nature of the work performed—meaning the differences in job titles or responsibilities are not relevant to the claims and defenses asserted—courts can, and do, conditionally certify classes that encompass a wide range of job titles and responsibilities.[71]

Here, the inspectors' dissimilar job titles and responsibilities do not preclude conditional certification. Thrower alleges that all UEI's inspectors were subject to the same pay practices which, if proven, is a *per se* violation of the

---

[69]     *Pacheco,* 2015 WL 1509570, at *7 (citing *Tolentino v. C & J Spec-Rent Services Inc.,* 716 F. Supp. 2d 642, 647 (S.D. Tex. 2010) (Jack, J.) ("[T]here must be a showing of some . . . nexus that binds the claims so that hearing the cases together promotes judicial efficiency.")).

[70]     *Wade v. Furmanite Am., Inc.,* 3:17-CV-00169, 2018 WL 2088011, at *3 (S.D. Tex. May 4, 2018) (Edison, M.J.) (quoting *Tamez v. BHP Billiton Petroleum (Americas), Inc.,* 5:15-CV-330-RP, 2015 WL 7075971, at *3 (W.D. Tex. Oct. 5, 2015)).

[71]     *Tamez,* 2015 WL 7075971, at *4 ("A class that encompasses a wide range of job positions may be conditionally certified as long as the differences between class members are not material to the allegations in the case." (collecting cases)); *see Kibodeaux v. Wood Group Prod.,* 4:16-CV-3277, 2017 WL 1956738, at *2 (S.D. Tex. May 11, 2017) (Ellison, J.) ("[A]lthough potential class members may have had different areas of expertise, [the plaintiffs'] claims do not appear to arise from circumstances purely personal to [them]. Because potential class members were paid in the same manner, and because their job duties were not different in ways that are legally relevant to their FLSA claim, the Court finds that the potential class members are similarly situated for purposes of conditional certification." (footnote citations omitted)).

FLSA—*i.e.,* the differences between class members' particular job titles and responsibilities are not material to the allegations in the case.[72]

As in *Wade v. Furmanite America, Inc.*, the court finds Judge Robert Pitman's decision in *Tamez v. BHP Billiton Petroleum (Americas), Inc.*,[73] particularly instructive. In *Tamez*, the plaintiff asked the court to conditionally certify a proposed class consisting of "all BHP Billiton employees who were paid a day rate, regardless of the nature of their responsibilities."[74] This broad definition included employees with at least eight different job titles and job responsibilities.[75] Like the defendants in the case at bar, BHP Billiton argued the proposed "class members . . . [were] not similarly situated" because of the stark differences between the proposed class members' job titles and responsibilities.[76]

Rejecting BHP Billiton's argument, the *Tamez* court found: (1) Tamez's day-rate allegation amounted to a *per se* FLSA violation that did not depend on the job title or responsibilities of each particular plaintiff; and (2) BHP Billiton had failed to demonstrate why any differences in job titles and responsibilities among class members were relevant given the day-rate allegation.[77] Based on these findings, the *Tamez* court conditionally certified the class, explaining:

---

[72]     *See Murillo v. Berry Bros Gen. Contractors Inc.*, 6:18-CV-1434, 2019 WL 4640010, at *4 (W.D. La. Sept. 23, 2019).

[73]     *Tamez*, 2015 WL 7075971.

[74]     *Id.* at *2.

[75]     *Id.*

[76]     *Id.*

[77]     *Id.* at *3–4.

The class definition proposed by Plaintiffs is admittedly broad. But, the Court nonetheless finds that dissimilar job responsibilities among the class have not been shown to be relevant to the Plaintiffs' FLSA allegations and, thus, are not a barrier to conditional certification.[78]

Here, as was the case in *Tamez* and *Wade*, the alleged FLSA violations do not depend on each particular plaintiff's job title or responsibilities. Rather, Thrower alleges UEI's inspectors were paid a fixed amount per day, irrespective of whether they performed work in excess of 40 hours in a given workweek.[79] If true, then the defendants violated the FLSA with regard to every non-exempt inspector who was not paid overtime at the legally-required rate.[80] In other words, any differences in job titles or responsibilities between potential class members are immaterial to the allegations in the case. Because Thrower alleges that the compensation scheme is, in and of itself, a violation of the FLSA, no further factual inquiry into the job duties of each potential class member is required, as "liability can be determined collectively without limiting the class to a specific job position."[81]

---

[78] *Id.* at *4.

[79] Dkt. 31 at 7.

[80] *See Hewitt*, 956 F.3d at 343–44 (finding employee who was paid a daily rate exceeding the FLSA's minimum-weekly-salary requirement for exemption from overtime compensation was not paid on a "salary basis" for purposes of the FLSA's overtime-compensation provisions); *see, e.g., Minyard*, 237 F. Supp. 3d at 490 (holding the purported dissimilarities between the proposed class members were "irrelevant because a common scheme or policy allegedly affected all non-exempt . . . employees"); *Song v. JFE Franchising Inc.*, 4:17-CV-1775, 2018 WL 3993548, at *4–5 (S.D. Tex. Aug. 20, 2018) (Polermo, M.J.) (conditionally certifying class, in part, because the defendant "failed to show why any differences in the job titles and responsibilities would be relevant to [the plaintiffs'] allegations").

[81] *Tamez*, 2015 WL 7075971, at *3; *accord Wade*, 2018 WL 2088011, at *4.

Accordingly, conditional certification is appropriate. The court now turns to the scope of the putative class.

## B. Class Definition

Thrower asks the court to certify a class consisting of:

> All current and former inspectors employed by Universal Ensco, Inc. and [sic] whose offer letter stated that they were paid a daily rate during at least one week in the three-year period prior to the date the Court authorizes notice to the present.[82]

"There is no question that the FLSA supports such a broad class definition if the pay practice complained of is company-wide."[83] Still, to justify such conditional certification, Thrower must show a company-wide policy or plan under which the proposed class members were subjected to the same FLSA violation(s).

Thrower has submitted declarations of four former UEI inspectors who worked for UEI in four[84] different states, each of whom testify the defendants "employ inspectors throughout the United States, including Kansas, Florida, Oklahoma, and Texas," and that they are "personally aware that other inspectors were also paid on a day[-]rate basis . . . ."[85]

---

[82]   Dkt. 53 at 1–2.

[83]   *Sanchez v. Schlumberger Tech. Corp.*, 2:17-CV-102, 2018 WL 2335333, at *9 (S.D. Tex. Jan. 24, 2018) (Ramos, J.) (citing *Rueda v. Tecon Services, Inc.*, CIV.A. H-10-4937, 2011 WL 2566072, at *4 (S.D. Tex. June 28, 2011) (Rosenthal, J.) and *Vargas v. Richardson Trident Co.*, CIV.A. H-09-1674, 2010 WL 730155, at *10 (S.D. Tex. Feb. 22, 2010) (Harmon, J.)).

[84]   Thrower repeatedly claims he was employed in Ohio, as well. *See, e.g.,* Dkt. 57 at 4. However, there is no evidence in the record to support this claim. *See* Dkt. 28–15 at 1 (Thrower's declaration, in which he testifies that he worked for UEI "in Kansas and Oklahoma").

[85]   Dkt. 28–15; Dkt. 28–16; Dkt. 28–17; Dkt. 28–18.

While Thrower's evidence in favor of certifying a nationwide class is a bit feeble, the defendants admit "UEI employs inspectors nationwide"[86] and do not contest Thrower's allegation that the day-rate pay practice applies uniformly to all UEI's inspector positions.[87] Instead, the defendants continue to argue that UEI's compensation scheme constitutes a "guaranteed" salary and attack only the inspectors' dissimilar job titles and responsibilities.[88]

Since geographic commonality is not a "similarly situated" requirement,[89] the court sees no reason to restrict the putative class to those states in which Thrower and the opt-in plaintiffs worked for UEI, especially when the defendants do not dispute that UEI pays its inspectors—irrespective of the state in which they are employed—on a day-rate basis. On this record, the court finds Thrower has met the notice stage's lenient standard of proof and established a colorable basis of a single, nationwide policy or practice of misclassifying UEI's inspectors as exempt from overtime compensation.[90] Accordingly, the court conditionally certifies the following class:

> All current and former inspectors employed by Universal Ensco, Inc.,
> for at least one week during the three-year period before this order,

---

[86] Dkt. 21 at 3.

[87] *See* Dkt. 31 at 18–20; Dkt. 56 at 5.

[88] *See id.* at 20–22; Dkt. 56 at 2–4; Dkt. 33 at 5–6.

[89] *Vargas*, 2010 WL 730155, at *6 (collecting cases).

[90] *See Burch v. Qwest Communs. Int'l, Inc.*, 500 F. Supp. 2d 1181, 1190 (D. Minn. 2007) ("Plaintiffs have established a colorable basis that they are victims of a single, nationwide policy by [the defendant] to illegally withhold overtime pay. At this initial stage, conditional certification of a nationwide class is appropriate.").

September 3, 2017, through September 3, 2020, whose offer letter states that they were paid a daily rate.[91]

## C. Notice to Potential Class Members

### 1. The Defendants' Objections to Thrower's Proposed Methods of Notice

Federal judges have the power to authorize the sending of notice to potential FLSA class members to inform them of the action and to give them the opportunity to participate by opting in.[92] "Notice is particularly important for FLSA collective actions as potential plaintiffs' statutes of limitations continue to run unless and until a plaintiff 'gives his consent in writing to become a party and such consent is filed in the court in which such action is brought.'"[93] It is well-settled that courts have wide discretion in deciding the notice's content and how notice is distributed.[94]

The defendants lodge several objections to Thrower's proposed notice to potential class members:[95] (1) the proposed notice fails to instruct potential opt-in class members that they may seek counsel of his or her own choice; (2) e-mail notice should not be allowed or, alternatively, only be permitted when notice via

---

[91]    Although the defendants' argument in favor of limiting the class is unpersuasive, the court has slightly modified Thrower's proposed class definition for clarity purposes.

[92]    *See Hoffmann-La Roche Inc.*, 493 U.S. at 169–70.

[93]    *Gronefeld v. Integrated Prod. Services, Inc.*, 5:16-CV-55, 2016 WL 8673851, at *5 (W.D. Tex. Apr. 26, 2016) (citing 29 U.S.C. § 216(b)).

[94]    *See Jackson v. Superior Healthplan, Inc.*, 3:15-CV-3125-L, 2016 WL 7971332, at *6 (N.D. Tex. Nov. 7, 2016) ("Because conditional certification is proper in this action, judicial approval of the form, content, and delivery method for a collective action notice is appropriate." (citing *Hoffmann-La Roche Inc.*, 493 U.S. at 171)).

[95]    *See* Dkt. 28–20 (Thrower's proposed notice).

first-class mail is returned as undeliverable; and (3) text-message notice should not be allowed.[96]

### i.     The Notice Should Advise Putative Class Members of Their Right to Choose Their Own Counsel

The court agrees with the defendants and finds that the proposed notice must advise putative class members of their right to retain separate counsel and pursue their rights independently from the class.[97]

### ii.    E-mail and Text-Message Notice

The defendants argue Thrower "has alleged no facts which would show [first-class] mail to be a deficient form of notice for this case."[98] First, that is not true—Thrower has produced evidence that notice by mail is insufficient for the potential class members.[99] But, more importantly, first-class mail, like payphones and dial-up internet, is quickly fading into obscurity.[100] Courts in this district, including this court, regularly allow notice by both mail and e-mail[101] because "e-

---

[96]     Dkt. 31 at 22–25.

[97]     *E.g., Snively v. Peak Pressure Control, LLC*, 174 F. Supp. 3d 953, 962 (W.D. Tex. 2016) (requiring the plaintiffs to submit a revised proposed notice including language advising putative class members of their right to seek separate representation by an attorney of their choosing).

[98]     Dkt. 31 at 23.

[99]     Dkt. 28—15 at 2 (testifying UEI inspectors will likely not receive notice if sent to their home address because they "routinely travel away from home for extended periods of time to perform their work").

[100]     *See Wade*, 2018 WL 2088011, at *7 ("Over the years, Americans have experimented with various means to deliver messages and notices, including the Pony Express, telegrams, and faxes—all now (or soon to be) considered relics of a bygone era. Truth be told, first-class mail is probably heading towards the same fate." (footnote citation omitted)).

[101]     *See Wade*, 2018 WL 2088011, at *7 (citing *Hernandez v. Robert Dering Constr., LLC*, 191 F. Supp. 3d 675, 684 (S.D. Tex. 2016) (Hanks, J.) (ordering defendants to produce its employees'

mail is not the wave of the future; e-mail is the wave of the last decade and a half."[102]

So, the true question before the court is whether to permit notice to potential plaintiffs via text message in addition to e-mail and mail.

Courts across the country are split as to whether a plaintiff should be permitted to send notice to potential class members in FLSA actions by text message in addition to other, more traditional, notice methods.[103] Courts that have allowed notice via text message have typically limited such notice "to cases where there is evidence that text messaging is a form of communication previously used by the employer to communicate with its employees, or where there is high turnover in employees."[104]

Recently, in *Dickensheets v. Arc Marine, LLC*, Judge Edison found "such tests to be unnecessarily restrictive," reasoning the salient question when it comes to the method of FLSA notice is whether "potential plaintiffs are more likely to receive notice of the lawsuit if the plaintiffs are permitted to deliver notice via text

---

known e-mail addresses) and *Jones*, 149 F. Supp. 3d at 777 (ordering production of potential class members' home and e-mail addresses for the purpose of facilitating notice)).

[102]   *Rodriguez v. Stage 3 Separation, LLC*, No. 5:14-CV-603-RP, 2015 U.S. Dist. LEXIS 188200, at *6 n.1 (W.D. Tex. 2015) (quotation cleaned up).

[103]   *See, e.g.,* Caley DeGroote, *Can You Hear Me Now? The Reasonableness of Sending Notice Through Text Messages and Its Potential Impact on Impoverished Communities*, 23 WASH. & LEE J. CIVIL RTS. & SOC. JUST. 279, 297-98 (2016) (discussing the split amongst federal district courts in allowing notice via text message) (collecting cases).

[104]   *Wingo v. Martin Transp., Inc.*, 2:18-CV-00141-JRG, 2018 WL 6334312, at *10 (E.D. Tex. Dec. 5, 2018) (internal quotation marks and citations omitted).

message in addition to e-mail and mail?"[105] In answering that question, Judge Edison held that "providing notice via text message in addition to other traditional notice methods will almost always be more appropriate in modern society."[106]

The court agrees. While e-mail is engrained in the fabric of our world's communication structure, there is no denying that it has become saturated and unwieldy. The cheery days of "You've got mail!" are long gone. Now, our virtual mailboxes are inundated with hundreds or thousands of messages. When it comes to our personal e-mail accounts, we have conditioned ourselves to tune the messages out, assuming they are unwanted advertisements, social-media notifications, unwelcome chain mail, a fake Nigerian prince seeking to transfer large sums of money out of the country, phishing scams, etc. The list goes on.

The flood of information can create an overwhelming feeling. So much so, that it is not uncommon for people to create a new e-mail account every couple of years, just to wipe the slate clean and rid themselves of the dread associated with sifting through hundreds of e-mails, searching for the few that actually contain important information. This is why e-mails have the infelicitous tendency of slipping through the cracks, especially when folks have multiple e-mail accounts (*e.g.,* work, personal, school) with which they must stay current.

---

[105]    *Dickensheets v. Arc Marine, LLC*, 440 F. Supp. 3d 670, 671–72 (S.D. Tex. 2020) (Edison, M.J.) (quotation cleaned up).

[106]    *Id.* at 672

Unlike e-mail, text messages, at the very least, have eyes laid on them before being opened or ignored. And while one's e-mail account is quickly becoming inseparable from their cell phone—that is to say, most people own a smartphone on which they receive text messages *and* e-mails[107]—a short vacation or busy workweek can result in literally hundreds of unread e-mails. The same cannot be said about text messages; people keep up with them. Maybe it is because texting is not as associated with work-related activities. Or maybe it is because texting is quickly becoming (if it has not already become) our primary method of communicating with friends and family. Whatever the reason, there is no denying that potential plaintiffs are more likely to receive notice of the collective action if a court allows text-message notice, in addition to e-mail and mail.[108]

In this case, text-message notice is particularly useful in helping to facilitate actual notice of the pending lawsuit, as the class involves pipeline workers who routinely travel for work and are away from their home for extended periods of time.[109] As Thrower explains in his declaration, due to the nomadic nature of their

---

[107]    As of February 2019, over 80% of Americans own a smartphone. PEW RESEARCH CENTER, *Demographics of Mobile Device Ownership and Adoption in the United States* (2019) (available at https://www.pewresearch.org/internet/fact-sheet/mobile/). That number jumps to 92–96% when you restrict the demographic to ages 18–49. *See id.*

[108]    *See Dickensheets*, 440 F. Supp. 3d at 672.

[109]    Dkt. 28—15 at 2 (testifying inspectors will likely not receive notice to their home address because they "routinely travel away from home for extended periods of time to perform their work"); *see generally Bhumithanarn v. 22 Noodle Mkt. Corp.*, 14-CV-2625 RJS, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015) (granting use of notice by text message "given the high turnover characteristic of the restaurant industry").

job, inspectors "will likely not receive the [n]otice or not receive the [n]otice with enough time to make a decision whether to join the case."[110]

Accordingly, in light of the overarching goal of providing potential class members the opportunity to join the case, the court finds that providing notice via text message serves to further the FLSA's remedial purpose.[111]

To alleviate any concern about a misleading or incomplete text message, the text message sent to potential class members must include a copy of the class notice that the court ultimately approves for distribution. As for the content of the text message, the court orders the parties to confer and attempt to reach an agreement by the deadline set below.

## 2. Notice Period

Thrower's motion for conditional certification does not include a proposed notice period. "Although opt-in periods commonly range from as little as 30 to as many as 120 days, most courts appear to default to a notice period of 60 days, unless potential plaintiffs are difficult to contact because of their locations or other extenuating factors warrant additional time."[112] Given the numerous methods of notice the court has approved, the court finds that a 60-day notice period is reasonable.

---

[110]    *Id.*

[111]    *See Dickensheets*, 440 F. Supp. 3d at 672; *Lejeune v. Cobra Acquisitions, LLC*, No. SA-19-CV-00286-JKP, 2020 U.S. Dist. LEXIS 146714, at *3 (W.D. Tex. 2020) (collecting cases permitting notice via text message);

[112]    *McCloud v. McClinton Energy Grp., L.L.C.*, 7:14-CV-120, 2015 WL 737024, at *10 (W.D. Tex. Feb. 20, 2015) (collecting cases).

### 3. Thrower's Request for Potential Class Members' Contact Information

The defendants also object to Thrower's request that the court order the defendants produce an excel spreadsheet with putative class members' (1) social-security numbers, (2) e-mail addresses, and (3) phone numbers (home and mobile), arguing it is "unnecessary and overly intrusive."[113]

The defendants are not required to produce potential class members' social-security numbers. Thrower has provided no justifiable basis for such information[114] and inadvertent disclosure could lead to unintended consequences such as identify theft.[115] However, as explained above, e-mail addresses and telephone numbers are fair game.

---

[113]    Dkt. 31 at 25. The defendants do not object to Thrower's request for potential class members' dates of employment (start and end date) or dates of birth. *See* Dkt. 28 at 30. Still, the court finds dates of birth are unnecessary and will not require the defendants produce such information.

[114]    Thrower argues social-security numbers will help allow him to "confirm current addresses and/or to locate those persons who may have moved from their last known address." Dkt. 28 at 30. Given the information the court is requiring the defendants to produce and the methods of notice the court has approved, the court finds that requiring the defendants to produce potential class members' social-security numbers to be superfluous.

[115]    *See Lee v. Veolia ES Indus. Services, Inc.*, 1:12-CV-136, 2013 WL 2298216, at *15 (E.D. Tex. May 23, 2013) ("[T]he undersigned finds it unnecessary for [the plaintiff] to receive social[-]security numbers of all potential plaintiffs at this time. In the event that [the plaintiff] is unable to determine the current mailing address of a potential plaintiff and he believes that an individual's social[-]security number is necessary to locate the individual, [the plaintiff] can request that particular plaintiff's social[-]security number at that time." (internal citations omitted)); *see also Heeg v. Adams Harris, Inc.*, 907 F. Supp. 2d 856, 865 (S.D. Tex. 2012) (Rosenthal, J.) (finding the plaintiff's request for potential class members' addresses and social-security numbers "overbroad and unsupported by the record") *Norman v. Neighborhood Healthcare Providers, PLLC*, 2:19-CV-170-KS-MTP, 2020 WL 4873848, at *5 (S.D. Miss. Aug. 19, 2020) (sustaining objection to produce potential class members' social-security numbers and dates of birth).

### 4. Form of Notice to Potential Class Members

The defendants "request that the [c]ourt provide time for the parties to confer and submit an agreed proposed notice (along with unresolved objections) upon resolution of the requested certification."[116] The court orders the parties to confer on any issues regarding the content of the notice and attempt to reach an agreement by the deadline set below. As for unresolved objections, the court finds that the defendants have waived[117] further objections to the notice—Thrower moves for both conditional certification *and* notice to potential class members.

*** 

Thrower has made a sufficient showing at this preliminary stage to warrant the issuance of notice, to permit full discovery, and to allow the court to conduct a more rigorous analysis at the decertification stage when it has the benefit of more information. Accordingly, Thrower's motion for conditional certification is GRANTED for a class defined as follows:

> All current and former inspectors employed by Universal Ensco, Inc., for at least one week during the three-year period before this order,

---

[116]    Dkt. 31 at 25 (citing *Melson v. Directech Sw., Inc.*, CIV.A. 07-1087, 2008 WL 2598988, at *5–6 (E.D. La. June 25, 2008)).

[117]    In their briefing, the defendants "reserve the right" to make additional objections to the proposed notice in the event the court grants Thrower's motion for conditional certification. Dkt. 31 at 25. The defendants have had plenty of time to raise other, reasonable objections. Additional delays in notice may preclude claims of potential class members. *E.g., Frazier v. Dall./Fort Worth Int'l Airport Bd.*, 285 F. Supp. 3d 969, 975 n.5 (N.D. Tex. 2018) (finding defendant's failure to raise objections to the plaintiff's proposed notice as a waiver, despite defendant's statement that it "reserves the right" to object to the proposed notice on other grounds if the court conditionally certifies the class); *Harger v. Fairway Mgmt., Inc.*, 2:15-CV-04232-NKL, 2016 WL 3200282, at *4 (W.D. Mo. June 8, 2016) ("The Court considers the failure to object [to the proposed notice], notwithstanding the reservation, as a waiver.").

September 3, 2017, through September 3, 2020, whose offer letter states that they were paid a daily rate.

It is further ORDERED that within fourteen days of this order, the defendants shall provide a list in an electronic format—whether it is in a spreadsheet is up to the defendants—of each individual's full name, last known mailing address, e-mail address (if known), telephone number (both home and mobile, if known), and date(s) of employment. Thrower shall have fourteen days from receipt of this information to send notice to potential class members. The opt-in period shall be sixty days from the date the notice is mailed or sent via e-mail or text message.

It is further ORDERED that the parties must confer and submit an agreed proposed text-message notice within fourteen days of this order.

It is further ORDERED that the parties must confer and submit an agreed proposed notice form and agreed proposed consent-to-join form within fourteen days of this order.

Signed on Galveston Island on this, the 3rd day of September, 2020.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE